## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TONY EVANGELISTA, individually and on behalf of all others similarly situated, ) ) ) | |
| Plaintiff, ) | **CIVIL ACTION NO. _____** |
| v. ) | |
| KCG HOLDINGS, INC., DEBRA CHRAPATY, DANIEL COLEMAN, PETER R. FISHER, CHARLES HALDEMAN, RENE M. KERN, JAMES T. MILDE, JOHN C. MORRIS, ALASTAIR RAMPELL, DANIEL F. SCHMITT, LAURIE M. SHAHON, COLIN SMITH, HEATHER E. TOOKES, and ADRIAN WELLER ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** |
| Defendants. ) | |

Plaintiff Tony Evangelista ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

### NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff brings this class action on behalf of the public stockholders of KCG Holdings, Inc. ("KCG" or the "Company") against the members of KCG's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rules 14a-9, 17 C.F.R. 240.14a-9, 17 C.F.R. § 244.100, and 17 C.F.R. § 229.1015(b)(4), arising out of their attempt to sell the Company to Virtu Financial, Inc. ("Virtu").

2.     On April 20, 2017, Virtu and the Company announced they had entered into an Agreement and Plan of Merger dated April 20, 2017 ("Merger Agreement"), by which Virtu,

through its wholly owned subsidiary, Orchestra Merger Sub, Inc. ("Merger Sub"), will acquire all of the outstanding shares of KCG in an all-cash transaction in which KCG stockholders will receive $20.00 per share (the "Proposed Transaction").

3.      The Proposed Transaction has a total transaction value of approximately $1.4 billion and is expected to close in the third quarter of 2017.

4.      On May 11, 2017, KCG filed a preliminary proxy statement on a Schedule 14A (the "Proxy") with the SEC.  The Proxy is materially deficient and misleading because, *inter alia*, it fails to disclose material information regarding the Company's financial projections, GAAP reconciliation of the non-GAAP financial measures contained in the Company's projections, which were prepared by Company management and relied upon by Goldman Sachs & Co. LLC ("Goldman"), the Company's financial advisor, the financial analysis performed by Goldman to support its opinion on the fairness of the Proposed Transaction, and the background of the Proposed Transaction.

5.      Without additional information the Proxy is materially misleading in violation of federal securities laws.

6.      By unanimously approving the Proposed Transaction and authorizing the issuance of the Proxy, the Individual Defendants participated in the solicitation even though they knew, or should have known, that the Proxy was materially false and/or misleading. The Proxy is an essential link in accomplishing, and receiving stockholder approval for, the Proposed Transaction.

7.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from conducting the stockholder vote on the Proposed Transaction unless and until the material information discussed below is disclosed to KCG's stockholders or, in the event the

Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

9.      Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) KCG maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES AND RELEVANT NON-PARTIES

11.      Plaintiff is, and has been at all relevant times, the owner of shares of common stock of KCG.

12.     KCG is a corporation organized and existing under the laws of the State of Delaware.  It maintains principal executive offices at 300 Vesey Street, New York, New York, 10282.

13.     Defendant Debra Chrapaty ("Chrapaty") has served as a director of the Company since 2015.

14.     Defendant Daniel Coleman ("Coleman") has served as a director of the Company and CEO since July 1, 2013 when Knight Capital Group, Inc. ("Knight") merged with GETCO Holding Company, LLC ("GETCO") to form the Company.

15.     Defendant Peter R. Fisher ("Fisher") has served as a director of the Company since January 18, 2017.

16.     Defendant Charles E. Haldeman ("Haldeman") has served as a director of the Company and Non-Executive Chairman of the Board since 2013.

17.     Defendant Rene M. Kern ("Kern") has served as a director of the Company since 2013 and served as a director of GETCO from 2007 until the merger creating KCG.

18.     Defendant James T. Milde ("Milde") has served as a director of the Company since 2013.  Defendant Milde served as a director of Knight from 2005 through the creation of the Company.

19.     Defendant John C. Morris ("Morris") has served as a director of the Company since 2013 and served as a director of GETCO from 2012 until the merger creating KCG.

20.     Defendant Alastair Rampell ("Rampell") has served as a director of the Company since 2015.

21.     Defendant Daniel F. Schmitt ("Schmitt") has served as a director of the Company since 2013 and served as a director of Knight from May 2012 until the merger creating KCG.

22.     Defendant Laurie M. Shahon ("Shahon") has served as a director of the Company since 2013 after serving as a director of Knight since 2006.

23.     Defendant Heather Tookes ("Tookes") has served as a director of the Company since January 18, 2017.

24.     Defendant Adrian Weller ("Weller") has served as a director of the Company since January 18, 2017.

25.     Defendants referenced in ¶¶ 13 through 24 are collectively referred to as Individual Defendants and/or the Board.

26.     Relevant non-party Virtu is a corporation organized and existing under the laws of the State of Delaware.  Virtu maintains its principal executive offices at 900 Third Avenue, 29th Floor, New York, New York, 10022.

27.     Relevant non-party Merger Sub is a Delaware corporation and wholly owned subsidiary of Virtu that was created for the purposes of effectuating the Proposed Transaction.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action as a class action on behalf of all persons and/or entities that own KCG common stock (the "Class").  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

29.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  The Proxy states that, as of April 17, 2017, there were 66,680,421 shares of common stock outstanding.  All members of the Class may be identified from records maintained by KCG or its transfer agent and

may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

30.     Questions of law and fact are common to the Class, including (i) whether Defendants solicited stockholder approval of the Proposed Transaction through a materially false or misleading Proxy in violation of federal securities laws; (ii) whether Plaintiff and other Class members will suffer irreparable harm if securities laws violations are not remedied before the vote on the Proposed Transaction; and (iii) whether the Class entitled is to injunctive relief as a result of Defendants' wrongful conduct.

31.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

32.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## FURTHER SUBSTANTIVE ALLEGATIONS

*Company Background*

34.     KCG is a leading independent securities firm offering investors a range of services designed to address trading needs across asset classes, product types and time zones. The firm combines advanced technology with specialized client service across market making, agency execution and venues and also engages in principal trading via exchange-based market making.

35. KCG was created by the 2013 merger of Knight and GETCO following Knight's near fatal trading error in August 2012. Both Virtu and GETCO competed to acquire Knight at that time, with GETCO the winner of the bidding war.

***The Sale Process***

36. On February 21, 2017, the Company's largest shareholder, Jefferies, informed Defendant Coleman of Virtu's interest in the Company and an upcoming formal offer. Jefferies controls approximately 24.5% of the Company. Two days later, on February 23, 2017, Virtu's Chief Executive Officer Douglas Cifu delivered a written proposal to Defendant Coleman to acquire the Company at a price ranging from $18.50 to $20.00 per share in cash.

37. On February 26, 2017, the Board met to discuss the proposal. At the same meeting, Defendant Coleman introduced a proposed plan to restructure the company without pursuing a merger or sale of the company. He also recommended that the Board hire an independent financial advisor to advise the Company.

38. On March 7, 2017, representatives of Jefferies encouraged Defendant Coleman to engage with Virtu in response to the offer.

39. The Board met again on March 10, 217 and following a presentation on considerations of the Virtu proposal, decided to postpone a formal response until the next meeting on March 15, 2017.

40. On March 14, 2017, Jefferies representatives spoke separately to Defendant Coleman and Defendant Haldeman to recommend engaging in discussions with Virtu.

41. The Board met again on March 15, 2017. Jefferies personnel attended the initial part of the meeting when Defendant Coleman's proposed restructuring plan was discussed. The

Board then discussed the Virtu proposal and received a presentation of Goldman's financial analysis of the Company and a preliminary list of other potential strategic buyers.

42.     Later that day, media outlets reported that Virtu had made an unsolicited offer to purchase the Company. The Company confirmed this in a press release later that day.

43.     Defendant Coleman sent a letter to Virtu's CEO, offering to meet with him and asking for Virtu to increase its offer price and provide additional detail on execution risks and Virtu's plans to retain the Company's employees.

44.     Virtu issued a press release on March 16, 2017, confirming that it had made an offer for the Company.

45.     Later that day, another party, Party A, contacted Defendant Coleman to indicate an interest in a strategic combination.

46.     The next day, the Company and Virtu entered into a non-disclosure agreement containing a standstill provision.

47.     The Board met on March 20, 2017 to discuss ongoing discussions with Virtu and the interest from Party A.

48.     On March 22, 2017, the Company entered into a non-disclosure agreement, containing a standstill provision, with Party A.

49.     On March 24, 2017, after preliminary due diligence, Party A informed Defendant Coleman that it was no longer interested in a potential transaction.

50.     On March 27, 2017, Goldman began contacting other potential bidders at the behest of the Board.  On March 29, 2017, Goldman reported that it had contacted six bidders, but that only one, a Party B, had requested additional information about the Company.  Party B then withdrew its interest on March 30, 2017.

51.     On April 10, 2017, Virtu sent the Company draft transaction agreements and a revised proposal to acquire the Company for $18.50 per share.

52.     At a meeting the next day, the Board rejected Virtu's revised proposal, in part because Virtu's financial advisor J.P. Morgan had informed Goldman, and Jefferies had informed Defendants Haldeman and Coleman, that the $18.50 per share price was not the best and final offer from Virtu.

53.     The next day, the Company received a revised bid for $20.00 per share. During a meeting later on April 12, 2017, the Board agreed to respond with a counter-offer for a purchase price of $20.21 per share, the book value of the Company as of March 31, 2017.

54.     Virtu responded through J.P. Morgan that it was unwilling to increase its price above $20.00 per share on April 17, 2017.

55.     The Board met on April 19, 2017 to discuss merger negotiations.  The Board tentatively agreed to a purchase price of $20.00 per share subject to a fairness opinion from Goldman.  The Board then approved the forecasts of the Company used in connection with the restructuring plan, and the use of the forecasts in the financial analysis by Goldman.

56.     Following final negotiations, the Board met again on the morning of April 20, 2017.

57.     After receiving Goldman's opinion that the merger consideration was financially fair, the Board approved the Proposed Transaction and authorized the execution of the Merger Agreement.

58.     Following the meeting, the Company and Virtu executed the Merger Agreement and other transaction documents.

59.     Virtu then issued a press release, reading in relevant part:

> NEW YORK, NEW YORK, April 20, 2017 – Virtu Financial, Inc. (NASDAQ: VIRT) today announced that it has entered into a definitive agreement to

acquire KCG Holdings, Inc. (NYSE: KCG), which has been unanimously approved by the Board of Directors of each company. Virtu has agreed to acquire KCG in a cash transaction valued at $20.00 per KCG share, or a total of approximately $1.4 billion.

The transaction will extend Virtu's scaled operating model to KCG's wholesale market making businesses and broaden the distribution of Virtu's technology and execution services to KCG's extensive institutional client base. Virtu expects to migrate trading of the combined company onto a single, proven technology, risk management, and analytics platform.

"KCG fits perfectly with Virtu's strategic priorities to apply our market making and technological expertise to customer wholesale order flow and expand Virtu's growing agency execution business by offering clients a combination of Virtu and KCG's superior algorithms and proprietary analytical tools. In addition, there is immediate opportunity for revenue growth and significant cost savings," said Douglas A. Cifu, Virtu's Chief Executive Officer.

Mr. Cifu continued, "Virtu and KCG both have a heritage of using technology to make markets more efficient. The combination of talented, dedicated professionals from KCG and Virtu will allow us to achieve more together than either firm could achieve alone."

The transaction is expected to close during the 3rd quarter in 2017 after receipt of KCG shareholder approval and all required regulatory approvals.

**Significant Value Creation through Synergies**
The transaction is expected to provide significant further scale and financial benefits to Virtu. Within two years of the completion of the transaction, Virtu expects to realize approximately $208 million of net pre-tax expense savings, in addition to $440 million of capital synergies. These savings do not include any revenue enhancements that Virtu anticipates to result from the transaction.

**Transaction Terms, Approvals and Timing**
Virtu intends to fund the cash transaction and debt refinancing with new gross borrowings of $1.65 billion and the sale of $750 million of common stock, priced at $15.60 per share. North Island, whose principals are Robert Greifeld and Glenn Hutchins, will invest $625 million in Virtu common stock, in partnership with GIC, Singapore's sovereign wealth fund, and Public Sector Pension Investment Board (PSP Investments), one of Canada's largest pension investment managers. Temasek, an existing Virtu shareholder, has committed to invest an additional $125 million in Virtu common stock. The sale of shares is conditioned upon the closing of the transaction.

Virtu has also entered into a commitment with J.P. Morgan Securities LLC, to provide up to $1.65 billion of debt financing for the transaction.

Virtu intends to maintain its annual dividend of $0.96 per share after the close of the transaction.

The transaction is subject to customary closing conditions, including the approval of the stockholders of KCG, and receipt of required regulatory clearances and approvals. Jefferies LLC, the largest shareholder of KCG, has entered into a voting agreement pursuant to which it has committed to vote the 24.5% of KCG's outstanding voting power it holds for the adoption of the merger agreement.

**Organization and Leadership**

Following the close of the transaction, Douglas A. Cifu, Virtu CEO, will remain CEO of the combined company. Joseph A. Molluso, Virtu CFO, will remain the CFO of the combined company.

Following the close of the transaction, the Board of Directors will consist of 10 directors, including 8 of the 10 members currently serving on the Virtu board. In addition, 2 new members from North Island, Robert Greifeld and Glenn Hutchins, will join Virtu's Board of Directors. These changes will be effective immediately upon closing.

### *The Materially Misleading and Incomplete Proxy*

60.    Defendants have failed to provide stockholders with material information necessary for an informed vote on the Proposed Transaction.  The Proxy, which recommends that the Company's stockholders vote in favor of the Proposed Transaction, misrepresents and/or omits material information in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *Misleading Statements and Omissions Regarding the Company's Financial Projections*

61.    The Proxy fails to provide material information concerning the Company's financial projections.

62.    The Proxy discloses "Unaudited Prospective Financial Information" that the Company provided to the Board and Goldman during the process leading up to the execution of the Merger Agreement.  The items forecasted include Net Revenue, Adjusted EBITDA, and Adjusted Earnings Per Share.

63.   The Proxy fails to disclose the following Company projections for years 2017 through 2021: (i) forecasts of KCG's future cash flows, including unlevered free cash flows, as derived from data provided by KCG senior management, and used in Goldman's *Illustrative Discounted Cash Flow Analysis*; (ii) the definition of unlevered free cash flow used by Goldman in its analyses, and a statement as to how it was calculated; (iii) stock-based compensation expense; and (iv) change in net working capital. Without these measures, cherry-picking the disclosed projections materially misleads KCG stockholders and renders the financial analyses meaningless.

64.   Specifically, with respect to KCG's projections, the Proxy states the following:

> The unaudited prospective financial information was not prepared with a view toward public disclosure, nor was it prepared with a view toward compliance with GAAP, published guidelines of the SEC or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information.

65.   The Proxy only provides Company projections for three metrics: Net Revenues, Adjusted EBITDA, and Adjusted Earnings Per Share. However, the Proxy fails to provide line item metrics used to calculate the non-GAAP measures of Adjusted EBITDA and Adjusted Earnings Per Share, or otherwise reconcile the non-GAAP projections to GAAP metrics. The omission of such projections renders the non-GAAP projections included in the Proxy materially incomplete and therefore misleading.

66.   Non-GAAP metrics, such as Adjusted EBITDA, Net Revenues and Adjusted Earnings Per Share do not have standardized, universally-understood definitions or formulas for calculation. For this reason, when a company discloses information in a Proxy that includes non-GAAP financial metrics, the Company must also disclose comparable GAAP metrics and a quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100.

67.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial metrics in communications with stockholders.  Recently, former SEC Chairwoman Mary Jo White stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as KCG has included in the Proxy), implicates the centerpiece of the SEC's disclosure regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

Further, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[2] In fact, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial metrics

---

[1]     Mary Jo White, Chairwoman, SEC, Keynote Address at the International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[2]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. TIMES, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

that demonstrate the SEC is indeed tightening policy.[3]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts.

68.     Thus, the above-referenced line-item projections that have been omitted from the Proxy are precisely the types of "reconciling metrics" that the SEC has recently indicated should be disclosed to render non-GAAP financial projections not misleading to shareholders.

### *Material Omissions Concerning Goldman's Financial Analyses*

69.     The Proxy describes Goldman's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Goldman's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, KCG's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Goldman's fairness opinion in determining how to cast their vote on the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to KCG's stockholders.

70.     The Proxy fails to disclose various material elements of the financial analyses performed by Goldman.  For example, Goldman performed an *Illustrative Discounted Cash Flow Analysis* ("DCF") that was presented to the Board, yet the Proxy fails to include the key inputs of this analysis, including (i) the estimated future cash flows that KCG is expected to generate for each of the full years 2017 through 2021, (ii) the definition of unlevered free cash flows used in

---

[3]     *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, SEC (May 17, 2016), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

the analysis, and (iii) the terminal year estimate of the free cash flow generated by the Company, as reflected in the forecasts.

71.     Goldman also performed a *Selected Companies Analysis* that was presented to the Board, yet the Proxy fails to disclose the observed multiples for each of the selected comparable companies analyzed by Goldman.

72.     Without such undisclosed information, KCG stockholders cannot evaluate for themselves whether the financial analyses performed by Goldman were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which Goldman's opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

### Standstill Provisions

73.     The Proxy discloses that the Company entered into non-disclosure agreements that contained standstill provisions with both Virtu and Party A during its search for strategic partners. However, the Proxy is materially misleading because it conceals the terms of these standstill agreements, and fails to state whether these standstill provisions contained don't-ask-don't-waive provisions or other terms that would contractually forbid the counterparties from coming forward with a superior offer, or "topping bid," to the Proposed Transaction.

74.     The disclosure of these agreements is particularly important in a transaction like this, where the Company has agreed in the Merger Agreement not to "terminate, waive, amend, modify or fail to use reasonable best efforts to enforce" any standstill provision under most circumstances.  Indeed, this provision in the Merger Agreement also strongly suggests that

restrictive standstill terms are currently in place, and currently operating to contractually forbid the counterparties from making topping bids.

75.     The omission of this information materially misleads KCG stockholders as to the ability of other parties to come forward with superior offers.

76.     Without the material information described above, stockholders cannot make an informed decision whether or not to vote in favor of the Proposed Transaction or seek appraisal for their shares, and have been harmed thereby. These omissions materially mislead KCG stockholders as to the as to the accuracy and value of the analyses underlying Goldman's fairness opinion, and the veracity of the fairness opinion itself.

77.     Defendants' failure to provide KCG's stockholders with the foregoing material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder.  The Individual Defendants were aware of their duty to disclose this information.  The material information described above that was omitted from the Proxy takes on actual significance in the minds of KCG's stockholders in reaching their decision whether to vote in favor of the Proposed Transaction.  Absent disclosure of this material information prior to the vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make an informed decision about whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm for which damages are not an adequate remedy.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder**

78.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

79.     Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction.

80.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

81.     Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omitted material facts that are necessary to render the statements that are made non-misleading.

82.     The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth.

83.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their right to cast a fully informed vote on the Proposed Transaction.

84.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

85.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

86.     The Individual Defendants acted as controlling persons of KCG within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of KCG, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

87.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy.

89.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants

reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

90.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

91.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

92.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)     declaring that the Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(C)     preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with,

consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

(D)     to the extent the Proposed Transaction is consummated prior to the Court's entry of a final judgment, awarding Plaintiff and the members of the Class rescissory damages against the Individual Defendants, including, but not limited to, pre-judgment and post-judgment interest;

(E)     awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

(F)     awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

(G)     granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  May 25, 2017

Respectfully submitted,

By: /s/ Michael Ershowsky
Michael Ershowsky
**LEVI & KORSINSKY LLP**
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: mershowsky@zlk.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**LEVI & KORSINSKY, LLP**
Donald J. Enright (to be admitted *pro hac vice*)

Elizabeth K. Tripodi (to be admitted *pro hac vice*)
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567
Email: denright@zlk.com
        etripodi@zlk.com

*Attorneys for Plaintiff*